Bucci v. Burns, 2018 NCBC 36.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 15478

MARCY BUCCI; KEVIN SALVA;
RICK BUCCI; EUGENE N. BUCCI;
EUGENE M. BUCCI; TOM
FERGUSON; DAVID LUBIN;
CHRISTINE MERRITT; KARL
SCHULER; MATTHEW
FERGUSON; CHARLES
FERGUSON; and LAUREL
MANDERBACH,

          Plaintiffs,

v.

ROBERT BURNS; ZEESHAN-UL-
HASSAN USMANI; and GARRETT
PERDUE,

          Defendants.

**ORDER AND OPINION
ON MOTION TO DISMISS**

1. This is an action for fraud by twelve individuals who invested in Predictify.me, Inc. ("Predictify.me") before the company went bankrupt. The Court dismissed the original complaint for want of particularity but granted Plaintiffs leave to amend their claims. Defendant Garrett Perdue now moves to dismiss all claims stated against him in the amended complaint. For the reasons given below, the Court **GRANTS** in part and **DENIES** in part the motion.

> *Meynardie & Nanney, PLLC, by Joseph H. Nanney, Robert A. Meynardie, and Robert W. Weston, for Plaintiffs.*

> *Graebe Hanna & Sullivan, PLLC, by Douglas Hanna, for Defendant Garrett Perdue.*

Conrad, Judge.

# I.
# BACKGROUND

2.     The Court does not make findings of fact on a Rule 12(b)(6) motion to dismiss.  The following factual summary is drawn from relevant allegations in the amended complaint.

3.     Predictify.me[1] was a technology company, co-founded in May 2014 by Defendants Zeeshan-Ul-Hassan Usmani, Robert Burns, and Garrett Perdue.  (*See* Am. Compl. ¶¶ 24, 31, ECF No. 29.)  Initially, Defendants were Predictify.me's only owners and also its officers and directors.  (Am. Compl. ¶ 32.)

4.     According to the amended complaint, Defendants jointly planned from the outset to market the new company to investors based on a falsehood: that Predictify.me owned proprietary technology developed by Usmani through his company, Go-Fig Solutions (Pvt) Ltd. ("Go-Fig").  (*See* Am. Compl. ¶¶ 24, 26–27.)  Plaintiffs allege that Predictify.me never acquired Go-Fig or its technology despite repeated representations by Defendants that it had in direct communications with investors, press releases, blog posts, and other social media.  (*E.g.*, Am. Compl. ¶¶ 38, 43, 50, 54–56, 126–28.)

5.     Plaintiff Marcy Bucci ("Bucci") was one of the first individuals to invest in Predictify.me.  She first met with Burns before the company was formed.  (Am. Compl. ¶¶ 26–29.)  A few months later, in June 2014, Bucci attended a meeting with Defendants and the advisors "help[ing] them find funding and investors."  (Am.

---

[1]   The original complaint referred to the company, apparently incorrectly, as "Predictifyme.com, Inc."

Compl. ¶¶ 35, 38.)  At that meeting, each Defendant "represented . . . that Predictify.me had acquired Go-Fig and its proprietary technology."  (Am. Compl. ¶¶ 37–38.)  Perdue followed up in person with Bucci in August, again to discuss her potential investment.  (Am. Compl. ¶ 41.)  Within two weeks of meeting with Perdue, Bucci purchased "preferred series seed stock" in Predictify.me.  (Am. Compl. ¶¶ 41, 94.)  She would do so five more times in 2014 and once in 2015.  (Am. Compl. ¶ 94.)

6.  Defendants hoped not only to secure Bucci's investment but also to tap into her network of potential investors.  (*See* Am. Compl. ¶¶ 30, 34, 50–51.)  Throughout most of 2014 and 2015, Defendants asked Bucci to "identify other potential investors . . . and provide them with the [] information regarding Predictify.me's business plans and its acquisition of Go-Fig."  (Am. Compl. ¶ 42; *see also* Am. Compl. ¶ 51.)  This information includes the representations at the June 2014 meeting, e-mail links to a presentation about Go-Fig, and "product scope sheets" authored by Perdue to "rebrand[] the Go-Fig Products for Predictify.me."  (Am. Compl. ¶¶ 29, 37–40, 43–45, 49.)  It also includes an investor disclosure notebook, which again "represented that Predictify.me had acquired Go-Fig and its proprietary technology."  (Am. Compl. ¶ 43.)

7.  Predictify.me appeared to enjoy initial success.  By the end of 2014, its website reported three new products based on the Go-Fig technology.  (*See* Am. Compl. ¶¶ 74–75.)  Around the same time, Defendants began telling Bucci that Predictify.me had entered into a business relationship with the United Nations, which Burns officially announced in an April 2015 quarterly investor report.  (*See*

Am. Compl. ¶¶ 77, 83–84.) In fact, there was no relationship with the United Nations. (*See* Am. Compl. ¶ 130.)

8. Throughout 2014 and 2015, Predictify.me gained investors, allegedly on the strength of the illusory Go-Fig acquisition and the non-existent relationship with the United Nations. Bucci shared the information she received from Defendants with family and friends. (*See* Am. Compl. ¶ 96; *see also* Am. Compl. ¶¶ 53, 87.) Two of them (Eugene N. Bucci and Christine Merritt) purchased preferred series seed stock in November and December 2014. (*See* Am. Compl. ¶¶ 97–100.) Six more (Rick Bucci, Eugene M. Bucci, Kevin Salva, Karl Schuler, Laurel Manderbach, and David Lubin) purchased convertible notes in May and June 2015. (*See* Am. Compl. ¶¶ 111–17, 120–23.)

9. Burns personally solicited others, including Plaintiffs Tom Ferguson, Charles Ferguson, and Matthew Ferguson. (*See* Am. Compl. ¶¶ 61, 67, 72.) Burns allegedly represented to each that Predictify.me had acquired Go-Fig and its technology, and he provided them with written materials, including the investor disclosure notebook. (*See* Am. Compl. ¶¶ 60–73.) Each purchased preferred series seed stock in November 2014. (Am. Compl. ¶¶ 101–06.)

10. By late 2015, "Predictify.me was failing financially." (Am. Compl. ¶ 135.) Looking for "alternative strategies," the board of directors "considered selling Go-Fig" only to discover that Predictify.me "did not own Go-Fig" or its software. (Am. Compl. ¶ 137.) In February 2016, Predictify.me's CEO "announced . . . that Predictify.me did not own, and had never owned, Go-Fig or its assets." (Am. Compl. ¶ 139.) Less than

four months later, Predictify.me filed for bankruptcy, and Plaintiffs lost their investments. (*See* Am. Compl. ¶¶ 142, 156, 165.)

11. The original complaint, filed on December 22, 2016, included claims for fraud, negligent misrepresentation, breach of fiduciary duty, and securities violations. Burns and Perdue each moved to dismiss the complaint. (ECF Nos. 12, 18.) The Court held that Plaintiffs' allegations were not stated with particularity, reasoning that the complaint did not attribute the alleged misrepresentations to any individual Defendant, that it "did not identify which Plaintiffs relied on any given misrepresentation," and that it was not "clear from the face of the complaint whether any individual Plaintiff ever interacted with any individual Defendant." (Order & Opinion on Mots. to Dismiss ¶¶ 23–24 ["Opinion"], ECF No. 28.) The Court dismissed all claims without prejudice but granted Plaintiffs' request for leave to amend. (Opinion ¶¶ 26, 35.)

12. Ten of the eleven original Plaintiffs, along with four new Plaintiffs, timely filed their amended complaint on October 16, 2017. The amended complaint asserts causes of action for fraud, negligent misrepresentation, violations of the North Carolina Securities Act, and unfair or deceptive trade practices. Two Plaintiffs have since voluntarily dismissed their claims without prejudice. (*See* ECF Nos. 48, 49.)

13. Perdue moved to dismiss all claims against him in the amended complaint on December 4, 2017. The motion has been fully briefed, and the Court held a hearing on March 13, 2018 at which all parties were represented by counsel. This motion is ripe for determination.

## II.
## ANALYSIS

14.  A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of the complaint." *Concrete Serv. Corp. v. Investors Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). "Dismissal of a complaint under Rule 12(b)(6) is proper when one of the following three conditions is satisfied: (1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint on its face reveals the absence of fact sufficient to make a good claim; (3) when some fact disclosed in the complaint necessarily defeats plaintiff's claim." *Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986).

15.  In deciding a Rule 12(b)(6) motion, the Court must treat the well-pleaded allegations of the complaint as true and view the facts and permissible inferences "in the light most favorable to" the non-moving party. *Ford v. Peaches Entm't Corp.*, 83 N.C. App. 155, 156, 349 S.E.2d 82, 83 (1986); *see also Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970). "[T]he court is not required to accept as true any conclusions of law or unwarranted deductions of fact." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 56, 554 S.E.2d 840, 844 (2001).

### A. Matters Outside the Complaint

16.  In support of his motion to dismiss, Perdue attaches four exhibits: Predictify.me's bankruptcy petition; the investor disclosure notebook; and two of Predictify.me's corporate formation documents (including the certificate of incorporation). (*See* ECF Nos. 37.1–37.4.) Plaintiffs object to the consideration of any

materials outside the amended complaint. (*See* Response Br. in Opp'n to Mot. Dismiss 9–10 ["Opp'n"], ECF No. 42.)

17. The general rule is that "matters outside the complaint are not germane to a Rule 12(b)(6) motion." *Weaver v. Saint Joseph of the Pines, Inc.*, 187 N.C. App. 198, 203, 652 S.E.2d 701, 707 (2007). That is because a Rule 12(b)(6) motion tests the *legal sufficiency* of the pleading, not the *evidentiary support* for the claims. *See, e.g.*, *White v. White*, 296 N.C. 661, 667, 252 S.E.2d 698, 702 (1979). Thus, Rule 12 itself makes clear that, if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment," not as a motion to dismiss for failure to state a claim. N.C. R. Civ. P. 12(b).

18. This rule does not extend to documents "attached to and incorporated within a complaint." *Weaver*, 187 N.C. App. at 204, 652 S.E.2d at 707. As the North Carolina Supreme Court recently explained, "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." *Krawiec v. Manly*, 2018 N.C. LEXIS 222, at *5 (N.C. Apr. 6, 2018) (quoting N.C. R. Civ. P. 10(c)) (alteration in original). Exhibits to the complaint are therefore intrinsic, not extrinsic, and a court may consider them without converting a motion to dismiss "into a motion for summary judgment." *Weaver*, 187 N.C. App. at 204, 652 S.E.2d at 707.

19. The circumstances in which a court may consider truly extrinsic material are narrow, chiefly limited to "documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers." *Oberlin Capital*, 147 N.C. App. at 60, 554 S.E.2d at 847 (citing *Robertson v. Boyd*, 88 N.C. App. 437, 441, 363

S.E.2d 672, 675 (1988)). A classic example is the contract at the heart of a claim for breach of contract. *See, e.g., Mkt. Am., Inc. v. Lee*, 809 S.E.2d 32, 40 & n.6 (N.C. Ct. App. 2017); *Oberlin Capital*, 147 N.C. App. at 60, 554 S.E.2d at 847.

20. These types of documents are integral to the claims. They do not implicate "[t]he obvious purpose" for excluding extrinsic matters at the Rule 12(b)(6) stage, which "is to preclude any unfairness resulting from surprise" and permit "a reasonable time" for the plaintiffs to offer rebuttal evidence. *Coley v. N.C. Nat'l Bank*, 41 N.C. App. 121, 126, 254 S.E.2d 217, 220 (1979). "Certainly the plaintiffs cannot complain of surprise when the trial court desires to familiarize itself with the instrument upon which the plaintiffs are suing because the plaintiffs have failed to reproduce" it within or attach it to the complaint. *Id.*; *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (reasoning that plaintiff had sufficient notice of extrinsic documents where it "has relied upon these documents in framing the complaint").

21. So long as no party questions the authenticity of a document that is integral to the claims, it makes good sense to permit its consideration without converting a motion to dismiss into a motion for summary judgment. *See, e.g., Bank of Am., N.A. v. Rice*, 244 N.C. App. 358, 372, 780 S.E.2d 873, 883 (2015) ("authenticity of" extrinsic documents uncontested); *Sec. Camera Warehouse, Inc. v. Bowman*, 2017 NCBC LEXIS 39, at *7–9 (N.C. Super. Ct. May 1, 2017) (authenticity of settlement agreement uncontested); *Tomlin v. Dylan Mortg. Inc.*, 2000 NCBC LEXIS 11, at *2 n.1 (N.C. Super. Ct. June 12, 2000); *see also Brackett v. SGL Carbon Corp.*, 158 N.C.

App. 252, 255, 580 S.E.2d 757, 759 (2003) (permitting consideration of documents that formed "procedural basis for complaint"); *Properties of S. Wake, LLC v. Fid. Bank*, 2012 N.C. App. LEXIS 1414, at *11 (N.C. Ct. App. Dec. 18, 2012) (unpublished) (permitting consideration of documents that formed "the very basis of this suit").[2]

22.     The two corporate formation documents offered by Perdue fall well outside these bounds.  Neither is the subject of the amended complaint or referred to by it. At most, Perdue contends that the amended complaint refers generally to the formation of Predictify.me in 2014.  (*See* Reply in Supp. of Mot. Dismiss 2 ["Reply"], ECF No. 43.)  That limited reference to a background fact is hardly a sufficient reason to treat all of the company's founding documents as fair game for review on a Rule 12(b)(6) motion.  *See Charlotte Motor Speedway, LLC v. Cty. of Cabarrus*, 230 N.C. App. 1, 5, 748 S.E2d 171, 175 (2013); *Goel v. Bunge, Ltd.*, 820 F.3d 554, 560 (2d Cir. 2016) (defendant may not create "bespoke factual record" on Rule 12(b)(6) review). The corporate formation exhibits are not integral to the claims, and the Court excludes them.

23.     The same is true for Predictify.me's bankruptcy petition.  Although the amended complaint alleges that "Predictify.me filed for chapter 7 bankruptcy," the bankruptcy petition is not the subject of the claims.  (Am. Compl. ¶ 142.)  In some circumstances, it may be permissible to take judicial notice of public court filings.

---

[2] This appears to be the prevailing rule in the federal courts.  *See, e.g.*, *Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare Inc.*, 367 F.3d 212, 234 (4th Cir. 2004); *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002); *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16–17 (1st Cir. 1998); *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir. 1998); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384–85 (10th Cir. 1997); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

*See, e.g.*, *Funderburk v. JPMorgan Chase Bank, N.A.*, 241 N.C. App. 415, 420, 775 S.E.2d 1, 4 (2015) (taking judicial notice of court orders in related proceedings); *but see Gilmore v. Gilmore,* 229 N.C. App 347, 350–51, 758 S.E.2d 42, 45 (2013) (denying request to take judicial notice). Perdue has not asked the Court to take judicial notice of the bankruptcy petition, and the Court declines to do so.

24. The investor disclosure notebook, on the other hand, is cited in the amended complaint as a source of one of the fraudulent representations central to Plaintiffs' claims. (*See, e.g.*, Am. Compl. ¶¶ 43, 49–53, 95–106, 109–17, 120–23.) Arguably, the Court could consider it. But Perdue offers the entire notebook (as opposed to the specific portion making the allegedly fraudulent representation), as a source of sundry facts to dispute motive and press for factual inferences in his favor. (*See* Mem. in Supp. of Def.'s Mot. Dismiss 12 ["Def.'s Br."], ECF No. 37.) This, the Rule 12(b)(6) standard does not allow, and the Court declines to consider the notebook. *See Schlieper v. Johnson*, 195 N.C. App. 257, 265, 266, 672 S.E.2d 548, 553, 554 (2009) (trial court should not "reject allegations" in complaint unless they are" "inexorably tied to" and "necessarily barred by" contradictory extrinsic document).

### B. Fraud and Negligent Misrepresentation

25. Plaintiffs assert their claims for fraud and negligent misrepresentation "in the alternative." (Am. Compl. ¶ 159.) As in the original complaint, these claims rest on the allegations that Defendants misrepresented Predictify.me's acquisition of Go-Fig and its relationship with the United Nations. (*See* Am. Compl. ¶¶ 147–48, 159.)

26. To state a claim for fraud, Plaintiffs must allege five "essential elements": (a) a false representation or concealment of a material fact; (b) that was reasonably calculated to deceive; (c) that was made with intent to deceive; (c) that did in fact deceive; and (e) that resulted in damage to the injured party. *Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17, 418 S.E.2d 648, 658 (1992). "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 484, 593 S.E.2d 595, 600 (2004) (citation omitted).

27. Perdue argues that these claims should be dismissed for three reasons. First, Perdue contends that the amended complaint does not allege that he actually made any misrepresentations to anyone other than Marcy Bucci. (*See* Def.'s Br. 13–14.) Second, Perdue argues that Predictify.me's bankruptcy, and therefore Plaintiffs' alleged injury, was not caused by the purported misrepresentations. (*See* Def.'s Br. 16–18.) And third, he argues that Bucci did not reasonably rely on any of the alleged misrepresentations because she could have discovered the truth about Predictify.me's business relationships. (*See* Def.'s Br. 18–19.)

1. Misrepresentations Attributable to Perdue

28. In dismissing the original complaint, the Court concluded that Plaintiffs had failed to "attribute any action to Perdue personally" and left uncertain "whether any individual Plaintiff ever interacted with any individual Defendant." (Opinion ¶¶ 23–24.) The amended complaint cures this deficiency by introducing more particular

allegations about each Defendant's role in carrying out the fraudulent scheme and the circumstances of each Plaintiff's investment in Predictify.me. (*See, e.g.*, Am. Compl. ¶¶ 37–38, 41, 43–45, 49, 97–106, 111–17, 120–23.)

29.     Perdue contends that the amended complaint, even accounting for the new allegations, still does not allege that he contacted any Plaintiff other than Bucci "or made any direct representations to the other Plaintiffs." (Def.'s Br. 13.) Perdue's point seems to be that, if these Plaintiffs were the victims of fraud by Burns and Usmani, he is not responsible for it.

30.     This is an overly formalistic approach to "the law of frauds," which "contains few absolutes." *Terry v. Terry*, 302 N.C. 77, 82, 273 S.E.2d 674, 677 (1981). Our Supreme Court has firmly resisted the development of "rules or definitions" that would be subject to ready evasion, instead "leav[ing] the way open to punish frauds and to redress wrongs perpetrated by means of them in whatever form they may appear." *Id.* (quoting *Standard Oil Co. v. Hunt*, 187 N.C. 157, 159, 121 S.E. 184, 185 (1924)). This includes fraud in the form of a conspiracy. The law of this State "permits one defrauded to recover from anyone who facilitated the fraud by agreeing for it to be accomplished." *Nye v. Oates*, 96 N.C. App. 343, 346–47, 385 S.E.2d 529, 531 (1989). "[A]ll of the conspirators are liable, jointly and severally, for the act of any one of them done in furtherance of the agreement." *Neugent v. Beroth Oil Co.*, 149 N.C. App. 38, 53, 560 S.E.2d 829, 838 (2002) (citation omitted).

31.     Plaintiffs allege a conspiracy: that Defendants agreed to induce individuals to invest in Predictify.me based on the misrepresentation that the company had

acquired Go-Fig and its technology. (*See* Am. Compl. ¶¶ 24, 146.) Perdue's role in the conspiracy is clearly defined. Plaintiffs allege that he personally met with Bucci to discuss her potential investment, falsely represented to her that Predictify.me had acquired Go-Fig, and urged her to share this information with other potential investors. (*See* Am. Compl. ¶¶ 41–42, 51.) Perdue also contributed to the investor disclosure notebook, which repeated the misrepresentation. (*See* Am. Compl. ¶¶ 43–53.) These allegations demonstrate an agreement to defraud and overt acts in furtherance of the agreement sufficient for Rule 12(b)(6) purposes. *See Nye*, 96 N.C. App. at 346–47, 385 S.E.2d at 531–32; *Perkins v. HealthMarkets, Inc.*, 2007 NCBC LEXIS 25, at *17–18 (N.C. Super. Ct. July 30, 2007) (denying motion to dismiss).

32. Plaintiffs do allege that the other Defendants (especially Burns) had far more direct contact with them than Perdue did. But the fact that Perdue may have been a "junior partner," so to speak, in the fraudulent scheme does not exonerate him. If Plaintiffs successfully prove their allegations of conspiracy, Perdue may be liable not only for his acts but also for those of the other conspirators. *See Neugent*, 149 N.C. App. at 53, 560 S.E.2d at 838; *Perkins*, 2007 NCBC LEXIS 25, at *17–18.

33. Perdue points out that many of the Plaintiffs had no direct contact with any of the Defendants but instead received information about Predictify.me from Marcy Bucci. (*See* Def.'s Br. 15–16.) These Plaintiffs, Perdue contends, rely on an impermissible theory of "indirect reliance." *E.g.*, *NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*, 2013 NCBC LEXIS 11, at *58 (N.C. Super. Ct. Feb. 19, 2013). The Court disagrees.

34. It goes without saying that an individual cannot be defrauded by a misrepresentation he never sees, hears, or even knows about. *See id.* (granting motion to dismiss); *Anderson v. Coastal Cmtys. at Ocean Ridge Plantation, Inc.*, 2012 NCBC LEXIS 35, at *38 (N.C. Super. Ct. May 30, 2012) (same). For that reason, our courts have routinely, and properly, rejected fraud claims in which an alleged misrepresentation by the defendant is altered by a third party who then passes on the "altered information" to the plaintiff. *Hospira Inc. v. AlphaGary Corp.*, 194 N.C. App. 695, 699, 671 S.E.2d 7, 11 (2009); *see also Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988) (dismissing negligent misrepresentation claim where plaintiff relied on third-party auditor's report rather than underlying information prepared by defendant), *rev'd on other grounds*, 329 N.C. 646, 407 S.E.2d 178 (1991).

35. Plaintiffs' allegations do not implicate these precedents. According to the amended complaint, at Defendants' request, Bucci shared with her family and friends the written materials actually prepared by Defendants, not a set of altered materials. (*See* Am. Compl. ¶¶ 53, 96.) Furthermore, most of the Plaintiffs allege that they relied directly on public statements made by Burns and Usmani, representing that Predictify.me had acquired Go-Fig and its technology. (*See* Am. Compl. ¶¶ 95–96, 102, 106; *see also* Am. Compl. ¶¶ 54–59.) Taking these allegations as true, Defendants intended for representations concerning Go-Fig to reach Plaintiffs, they did in fact reach Plaintiffs through written materials or public statements, and Plaintiffs relied on them. (*See* Am. Compl. ¶¶ 96, 98, 100, 102, 104, 106, 110, 112,

114, 116–17, 121, 123.)   These allegations sufficiently plead direct, not indirect, reliance.  *See Rowan Cty. Bd. of Educ.*, 332 N.C. at 21, 418 S.E.2d at 661 (holding that jury could find reasonable reliance by plaintiff on misrepresentation communicated through third-party catalog).

2.  Loss Causation

36.   Perdue next challenges loss causation.  He contends that Predictify.me's bankruptcy was "unrelated to the misrepresentations at issue."  (Def.'s Br. 17.) Rather, Predictify.me failed because Go-Fig's technology "did not work."  (Reply 12.)

37.   Plaintiffs allege they purchased interests in Predictify.me based on the misrepresentation that the company owned a valuable asset, namely the Go-Fig technology.  (*See* Am. Compl. ¶¶ 147, 155, 159, 164.)  When Predictify.me's prospects dimmed, it was revealed that the company never owned this key asset.  (Am. Compl. ¶¶ 135–41.)  At that point, Predictify.me's board considered its options, concluded that it could not sell Go-Fig (which it did not possess), and filed for bankruptcy.  (Am. Compl. ¶¶ 136–37, 142.)

38.   Pinpointing the causal link between the alleged misrepresentations and Plaintiffs' loss is no easy task.  Predictify.me was apparently on the ropes before its board learned the truth about Go-Fig.  And as Perdue notes, the amended complaint alleges that Predictify.me actually used "the technology developed by Go-Fig."  (Am. Compl. ¶ 75.)  Predictify.me's failure, despite using the Go-Fig technology, could suggest that Defendants' misrepresentations did not cause Plaintiffs' damages.

39.     Yet, at this early stage, the Court must construe all inferences in Plaintiffs' favor. *See Hunter*, 162 N.C. App. at 481, 593 S.E.2d at 599.  Another plausible inference is that Go-Fig and its underlying technology had substantial value even if Predictify.me had not yet found a way to monetize the technology.  Had Predictify.me actually owned these assets, perhaps it could have avoided bankruptcy by selling some or all of the technology, licensing it, partnering with others, or finding another solution.  When it became widely known that Predictify.me did not own the assets, its value plummeted, resulting in bankruptcy and total loss to investors.  Viewed in a light most favorable to Plaintiffs, the facts alleged are sufficient to plead causation. *See* Restatement (Second) of Torts § 548A, cmt. b ("[O]ne who misrepresents the financial condition of a corporation in order to sell its stock will become liable to a purchaser who relies upon the misinformation for the loss that he sustains when the facts as to the finances of the corporation become generally known and as a result the value of the shares is depreciated on the market.").

40.     Of course, Plaintiffs must develop evidence to support their allegations of causation.  Whether they can do so is a question for another day.  At this stage, the inferences must favor Plaintiffs, and the Court is reluctant to conclude that they cannot succeed as a matter of law.

3.  Reasonable Reliance

41.     Perdue separately contends that Bucci could not have reasonably relied on any alleged misrepresentations.  Perdue bases this argument on his assertion that Bucci became a director of Predictify.me and "was privy to all of the information of

the company." (Def.'s Br. 18.) The amended complaint, however, does not allege that Bucci was a director, and the Court may not consider extrinsic matters. Perdue and the other Defendants may, of course, raise the issue in a motion for summary judgment at the appropriate time.

\*      \*      \*

42. For these reasons, the Court concludes that Plaintiffs have adequately stated claims for fraud and negligent misrepresentation against Perdue. The Court denies the motion to dismiss as to these claims.

## C. North Carolina Securities Act

43. The North Carolina Securities Act ("NCSA") "creates private rights of action that are complementary to federal securities schemes." *Piazza v. Kirkbride*, 785 S.E.2d 695, 707 (N.C. Ct. App. 2016). Liability for securities violations may be either "'primary' or 'secondary.'" *Id.* (citing N.C. Gen. Stat. §§ 78A-56(a)(1)–(2), (c)).

44. There are "two different pathways to primary liability." *Highwoods Realty*, 2013 NCBC LEXIS 11, at *29. The first "sounds in fraud," and "[t]he second pathway is through making false or misleading statements." *Id.* (citing N.C. Gen. Stat. § 78A-56(a)(1), (2)). Both of these "antifraud provisions" restrict primary liability to "one who sells or offers for sale a security." *Id.* at *29, 33; *see also Piazza*, 785 S.E.2d at 709. An "'offer to sell' includes every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." N.C. Gen. Stat. § 78A-2(8)(b). North Carolina courts "place great emphasis on the solicitation of the buyer as the most critical stage of the selling transaction in determining who is an offeror

or seller of securities." *Atkinson v. Lackey*, 2015 NCBC LEXIS 21, at *23 (N.C. Super. Ct. Feb. 27, 2015) (citation, alteration, and quotation marks omitted).

45.     "If primary liability exists" for a given securities transaction, then individuals who "'materially aided' in the transaction" may be subject to secondary liability. *Highwoods Realty*, 2013 NCBC LEXIS 11, at *29.  Material aid has been defined to include "conduct that rises to the level of having contributed substantial assistance to the act or conduct leading to primary liability under the NCSA." *Bradshaw v. Maiden*, 2015 NCBC LEXIS 80, at *42 (N.C. Super. Ct. Aug. 10, 2015) (citing *Highwoods Realty*, 2013 NCBC LEXIS 11, at *49).  "The secondarily liable parties are 'jointly and severally' liable 'to the same extent' as the primarily liable person." *Piazza*, 785 S.E.2d at 709 (quoting N.C. Gen. Stat. § 78A-56(c)(1)–(2)).

46.     Here, Plaintiffs allege theories of primary and secondary liability based on the same allegations underlying the claims for fraud and negligent misrepresentation.  (*Compare* Am. Compl. ¶¶ 169–71 (NCSA), *with* Am. Compl. ¶¶ 147–48 (fraud), *and* Am. Compl. ¶ 159 (negligent misrepresentation).)  Plaintiffs allege that each Defendant offered or sold securities in Predictify.me or, alternatively, materially aided in the transactions.   (*See* Am. Compl. ¶¶ 172–73.)

47.     Perdue argues that Plaintiffs have failed to state a claim under either theory.  He contends there is no allegation that he solicited any Plaintiff, thus defeating any theory of primary liability.  (*See* Def.'s Br. 9; Reply 4.)  Perdue also argues that Plaintiffs failed "to allege specific facts that [he] 'knowingly' and 'materially aided' in the consummation of the primary violation."  (Def.'s Br. 10.)

48.     Whether Plaintiffs have alleged facts sufficient to plead a theory of primary liability as to Perdue is a close call.  In interpreting federal securities laws, the United States Supreme Court has held that the phrase "offer or sell" is broad enough to include solicitation but not so broad that it "impose[s] liability on participants collateral to the offer or sale." *Pinter v. Dahl*, 486 U.S. 622, 650 (1988).  Federal courts have understood *Pinter* to require allegations or evidence that the defendant "had some 'direct' role in the solicitation of the plaintiff." *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549 (N.D. Cal. 2009); *see also, e.g., In re Westinghouse Sec. Litig.*, 90 F.3d 696, 716 (3d Cir. 1996) (Alito, J.).  *Pinter* and its progeny are persuasive authority in construing the same language in section 78A-56.  *See Piazza*, 785 S.E.2d at 708.

49.     As alleged, Perdue's direct contact with Plaintiffs was limited.  He met personally with Bucci, provided information to her about Predictify.me, and "discussed" her potential investment in the company.  (*See* Am. Compl. ¶ 41.)  Bucci then invested two weeks later.  (*See* Am. Compl. ¶ 94.)  Construed liberally, these allegations are sufficient to plead that Perdue had a direct role in soliciting Bucci's investment.  *See Atkinson*, 2015 NCBC LEXIS 21, at *17–18.

50.     There are no allegations that Perdue had direct contact with any other Plaintiff.  Ordinarily, that would end the inquiry.  *See, e.g., Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) ("To count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer.").  Some courts, however, have acknowledged rare circumstances in which solicitations by another party are

attributable to a defendant, making the defendant an offeror or seller. *See, e.g.*, *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988); *Charles Schwab*, 257 F.R.D. at 549; *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1063–64 (D. Minn. 2003); *In re Chaus Sec. Litig.*, No. 88 Civ. 8641 (SWK), 1990 U.S. Dist. LEXIS 15810, at *25–26 (S.D.N.Y. Nov. 20, 1990).

51.    Plaintiffs have alleged that Perdue actively conspired and worked in concert with Burns and Usmani to identify new investors, and he joined in creating and distributing written investor materials for that purpose. (*See* Am. Compl. ¶¶ 35, 39, 43–51.)    Plaintiffs have also alleged that Perdue urged Bucci to provide those materials to her family and friends to secure their investments. (*See, e.g.*, Am. Compl. ¶¶ 49, 51, 53.)    All of the Plaintiffs received solicitations either from Burns (with whom Perdue allegedly conspired) or through Bucci (to whom Perdue provided the allegedly fraudulent investment materials). (*See, e.g.*, Am. Compl. ¶¶ 61, 67, 72, 92, 96.) These allegations, construed liberally, state a claim that Perdue was "sufficiently involved in the solicitation of sales to be considered [a] seller[]," if only minimally so. *Chaus*, 1990 U.S. Dist. LEXIS 15810, at *26 (denying motion to dismiss); *see also Charles Schwab*, 257 F.R.D. at 549–50 (same); *Stephenson*, 282 F. Supp. 2d at 1063–64 (same).

52.    In the event Perdue's actions do not amount to solicitation, the amended complaint adequately pleads secondary liability as an alternative.    Taking the allegations as true, Perdue conspired to induce investment in Predictify.me based on a falsehood, misrepresented the acquisition of Go-Fig to Bucci personally,

participated in the creation of written investor materials containing the same misrepresentation, and encouraged Bucci to provide those materials to her family and friends—all for the purpose of inducing Bucci and others to invest in Predictify.me. (*E.g.*, Am. Compl. ¶¶ 24, 38–40, 42–43, 47, 51.) These allegations sufficiently plead the type of material aid and substantial assistance contemplated by the NCSA. *See Bradshaw*, 2015 NCBC LEXIS 80, at \*42–43 (denying motion to dismiss) (citations omitted); *see also Highwoods Realty*, 2013 NCBC LEXIS 11, at \*43–47 ("'materially aiding' arguably is comparable to tort liability based on 'aiding and abetting'").

53. As this Court has noted in other cases, "proving the existence and extent" of a defendant's knowledge may be difficult "during later proceedings." *Bradshaw*, 2015 NCBC LEXIS 80, at \*43. But Plaintiffs' clear and consistent allegations that Perdue knew the truth but nonetheless conspired with others to defraud Plaintiffs are sufficient "to withstand" Perdue's motion to dismiss. *Id.* at \*44 (denying motion to dismiss where plaintiffs alleged actual knowledge "of the facts by reason of which liability is alleged to exist"); *see also Highwoods Realty*, 2013 NCBC LEXIS 11, at \*56 (describing knowledge and material aid elements as "necessarily fact-intensive inquiries").

54. Finally, Perdue contends that the securities claim must be dismissed because the amended complaint does not sufficiently allege loss causation and because Bucci could not reasonably rely on any purported misrepresentations. The Court has already rejected those arguments in connection with the claims for fraud and negligent misrepresentation. *See also Highwoods Realty*, 2013 NCBC LEXIS 11,

at *36 n.2 (noting that it may be unnecessary to consider loss causation "in light of the NCSA's limitation to a rescission remedy").

55.    Accordingly, the Court concludes that Plaintiffs have stated a claim for relief under the NCSA.  The Court denies the motion to dismiss as to this claim.

### D.  Violation of Section 75-1.1

56.    Plaintiffs' claim for a violation of N.C. Gen. Stat. § 75-1.1 is premised on the same underlying facts as their other claims.  (*See* Am. Compl. ¶¶ 177–80.)  Perdue contends that the claim must be dismissed because section 75-1.1 does not extend to securities transactions.  (Def.'s Br. 8.)

57.    Section 75-1.1 does not "govern all wrongs."  *Sterner v. Penn*, 159 N.C. App. 626, 633, 583 S.E.2d 670, 675 (2003) (internal punctuation omitted).  "[P]laintiffs must 'first establish that defendants' conduct was in or affecting commerce before the question of unfairness or deception arises.'"  *Id.* (quoting *HAJMM v. House of Raeford Farms*, 328 N.C. 578, 592–93, 403 S.E.2d 483, 492 (1991)).  "Although [the] statutory definition of commerce is expansive," it does not include "securities transactions," which are extraordinary events that fall outside the statute's purview.  *HAJMM*, 328 N.C. at 593, 403 S.E.2d at 492.  Our legislature did not intend for section 75-1.1, "with its treble damages provision, to apply to securities transactions which were already subject to pervasive and intricate regulation" under state and federal statutes. *Skinner v. E.F. Hutton & Co.*, 314 N.C. 267, 275, 333 S.E.2d 236, 241 (1985) (quoting *Linder v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 167 (4th Cir. 1985)).

58. Both sides assume that the transactions at issue—purchases of "either stock or a convertible note"—involved securities. (Am. Compl. ¶ 93; *see also* Def.'s Br. 8.) On this assumption, Perdue seeks dismissal. (*See* Def.'s Br. 8.) Plaintiffs respond that they are entitled to plead a section 75-1.1 violation in the alternative in the event any given transaction does "not amount to a securities transaction." (Am. Compl. ¶ 177; *see also* Opp'n 29.)

59. Perdue is correct as to the alleged stock purchases. The NCSA defines "[s]ecurity" to include "stock," and stock purchases are plainly securities transactions. N.C. Gen. Stat. § 78A-2(11). Plaintiffs may not seek recovery under section 75-1.1 for these purchases as a matter of law. *See HAJMM*, 328 N.C. at 594, 403 S.E.2d at 493; *Sterner*, 159 N.C. App. at 634, 583 S.E.2d at 676. The section 75-1.1 claims of Marcy Bucci, Eugene N. Bucci, Christine Merritt, Tom Ferguson, Charles Ferguson, and Matthew Ferguson are therefore dismissed.

60. It appears likely that the purchases of convertible notes are also securities transactions, but the issue is not sufficiently clear to permit a final decision at the pleading stage. The NCSA further defines "[s]ecurity" to include "any note," N.C. Gen. Stat. § 78A-2(11), which raises a rebuttable presumption that every note is a security, *see Saw Plastic, LLC v. Sturrus*, 2017 NCBC LEXIS 76, at *18–19 (N.C. Super. Ct. Aug. 25, 2017) (citing *Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990)). The pleadings provide little detail about the convertible notes, and the parties' briefs omit any discussion of this question. Until discovery clarifies the facts and the parties' positions, it would be premature to conclude that the notes are necessarily securities.

*See also Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 Del. Ch. LEXIS 125, at *19–20 & nn.39, 40 (Del. Ch. May 28, 2010) (analyzing case law treating convertible notes as securities). The Court therefore denies the motion to dismiss the section 75-1.1 claims of Laurel Manderbach, Kevin Salva, Karl Schuler, Rick Bucci, Eugene M. Bucci, and David Lubin.

### III.
### CONCLUSION

61. The Court **DENIES** the motion to dismiss as to the claims for fraud, negligent misrepresentation, and securities fraud. The Court also **DENIES** the motion to dismiss the section 75-1.1 claims of Laurel Manderbach, Kevin Salva, Karl Schuler, Rick Bucci, Eugene M. Bucci, and David Lubin. The Court **GRANTS** the motion to dismiss the section 75-1.1 claims of Marcy Bucci, Eugene N. Bucci, Christine Merritt, Tom Ferguson, Charles Ferguson, and Matthew Ferguson, and these claims are dismissed with prejudice.

This the 25th day of April, 2018.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases